0499008, Raley v. Brown. Each side has 30 minutes. Good morning. Good morning, Your Honor. May it please the Court, Robert Bacon for the appellant David Raley, reserving six minutes for rebuttal. Two juries considered whether David Raley should live or die. The first one couldn't come to a decision. The second one asked if there was psychological evidence. When told there was not, after another hour and 15 minutes of deliberation, returned a verdict of death. Rarely is the Court going to see such strong evidence that the case is a close one as to penalty, such powerful evidence that ineffective assistance of counsel was prejudicial. Fundamentally, the question that the second jury was asking was, why did this crime happen? Mr. Raley's counsel had not prepared a mental health expert, had not presented a mental health expert, so her presentation to the jury had raised this question but had not answered it. So the question from the jury helps to demonstrate deficient performance as well as prejudice. It was clear to this lay jury that an expert was needed. Counsel, I have some questions for you about the competence prong, the first prong of Strickland. Yes. What's unusual to me about this case is that this same lawyer had been second chair during the first penalty phase in which the defense was successful in not having a death sentence. And that successful penalty phase trial, number one, did not contain an expert. And from my reading of the record in front of us, what this lawyer concentrated on was trying to duplicate the success of that first time. She went and interviewed all of the jurors and didn't ignore the possibility of a mental health defense, did consult with, looked at the records and consulted with a mental health expert as well. And even though you or I might have made a different decision, why isn't that a professionally competent approach since she knew that her first one had been successful without an expert? A couple of parts to that answer. One of them being that the prosecutor did not rest on his presentation from the first trial. He went out, pounded the pavement, found additional aggravating evidence in the form of the incidents with the neighborhood children that he hadn't been aware of before. And she knew through discovery that the prosecutor was not resting on the case that had been presented before. The second reason is that neither counsel consulted an expert specifically with mitigation background and life history in mind. The third form of ineffectiveness recognized in Bean and Summerlin and Daniels, a closely related part of that answer, is that this court has said that experts consulted for that purpose must be given background information about the client's upbringing and history, the fruits of the investigation required by Wiggins. That's in cases such as Wallace and Carrow and Joe Smith. No expert was ever given that background by either of Mr. Raley's counsel. So we do not have here the fully informed decision based upon consultation with appropriately informed experts. And I think that that type of consultation was the predicate of Your Honor's question, but that's factually not what we have here. Mr. Bacon, do I understand correctly that when Dr. Spiegel was presented with this other information that was developed later, that you say should have been given to him early on but wasn't, he still stuck with his opinion that the petitioner knew what he was doing, he could have controlled himself if he had wanted to? I believe that that is part of what he said in his declaration. Then he went on, apropos of the mitigation issues, apropos of the penalty phase issues, to indicate that this life history did serve for him to explain Mr. Raley's impairments, explain his upbringing, these impairments that manifested themselves in the crimes that were committed. But wouldn't a lawyer make a judgment call that maybe the good to come from that extra opinion that Dr. Spiegel would have rendered is outweighed by the bad part of the opinion that Dr. Spiegel would have rendered? Do you want to refill on that? I don't know. I'm doing fine. Okay. I think that what Your Honor is positing I think is quite, strikes me as quite similar to what was found to be ineffective in the Carro case, where the link was never made, there were experts, there was information about his background and his pesticide exposure, but still the missing link was not there, the one that's found necessary in Carro, the one that Mr. Raley's jury, by way of their question, had. Is there really something? Because I understood Carro, you've got a whole separate and sort of unanticipatable effect of the pesticides. That the expert being consulted would have no other, or had no other reason to suspect existed. In this case, I mean, I try to put myself in the position of the lawyer, and I like to think, well, I would have made different judgments or done different things, but I'm not sure at what point the lawyer can be expected to guide the mental health professional on what it is the mental health professional should be asking about. And the kind of information that you've argued should have been provided by the lawyer is the kind of information that I would have expected the expert, if he or she thought it was important in a given case, would be asking about or seeking. And in this case, there's no indication that there were requests by the experts that the lawyer did not respond to. The law from this circuit is, particularly in the Wallace case and a number of others, is that there is an independent obligation on the part of counsel to furnish the life history information to the mental health expert. Because I think there is an analogy to Caro to the poisons that he had been exposed to growing up, and we call them the kind of poisons that Mr. Raley had been exposed to in his upbringing. And this, speak a few moments about that. And this is the core of the kind of information that is dealt with by Wiggins in the cases concerning counsel's interaction with mental health experts. Beginning with the babysitters who had seen through the facade of the middle-class normalcy that this family had gone to such lengths to project, seen the physical and psychological neglect the boy brought to them in the having sat in soiled diapers for hours, the bruises on the body, severe beatings unpredictably inflicted for trivial incidents such as the time he didn't put on his shoes fast enough. The defendant's father, who was counsel called as the witness before the penalty jury, understandably didn't testify about that. Dr. Cetellini reporting that when David had problems in school, psychological problems, academic problems, that parental support was simply absent. There was testimony at the penalty phase about abuse in the home, wasn't there? There was. The jury did see the tip of the iceberg. They saw it almost entirely from Mr. Raley's father and his sister. They didn't get the full picture because of the biases, the emotional investments of family members as the Court recognized in the Boyd case. Apart from that, the limited perspective, a young person simply is going to appear differently to his peers, to his schoolteachers than to his immediate family. The testimony from the father and the sister about the abuse led the prosecutor to call Mr. Raley's mother as a rebuttal witness to deny what they had said and point the fingers at one another. It was he said, she said. And at this point, the real message was lost. The dysfunction in the family had gone far beyond Elvis' drunken rages. It had impacted David. It impaired him in ways that the jury wouldn't have been able to intuit from the limited amount that it did hear from those immediate family members. Impaired him, impacted him in ways related to the crimes, what the Court found missing in Al and what the Court said was so important in Carol. The over-sexualized, inappropriately sexualized nature of David Raley's upbringing was mentioned to the jury, but again, the whole picture wasn't there. The real picture wasn't there. The exhibitionist mother, who had had an incestuous relationship herself as a child, who at various times accused her son of being sexually interested in both of his parents, who called him a faggot, who called him a voyeur. David knew of both his parents' adulterous relationships. David was humiliated by his father because he didn't have a girlfriend and was clueless as to how to form an appropriate relationship with a young woman. None of this detail, none of this that is so much more related to the charged crimes and to the uncharged misconduct and aggravation, this the jury didn't hear. The jury didn't hear from any of Mr. Raley's peers as a teenager and a young adult. They saw him starved for positive attention, just like the babysitters had when he was a little boy. They saw him hypervigilant, always afraid that something bad was going to happen, because invariably it had in his home. They saw him functioning at a much younger level than his actual age, immature, with thinking fantasies, acute social awkwardness, 23 years old, still dependent on his father, incapable of living anywhere else, but still treated by his father as though he were a young child. All of this was essential to answer the explanation question for the experts and for the jury, and none of it could Ralph Raley, David's father, testify to. He did not testify to it. And finally, the parents' divorce, when Ralph used David to serve the papers on Elba. When David was in legitimate fear that he would have to testify in open court about Elba's adultery and Elba's abuse. When David was in fear that he would lose the family home and knew that he was incapable of living anywhere else. And finally, two days before the incident at the Carolans' mansion, when David sat in the corridor of the courthouse and heard his mother disown him one more time, and say in the court that she wished that she could divorce her children as well as her husband, in that family divorce is found the largest part of the answer to the question, why did this happen on February 2nd, 1985, not on some other day, when some other teenagers were visiting up at the mansions? I have no doubt that there is additional evidence that could be submitted and could have been submitted. What I'd like for you to give me some help with is, what is it that makes the failure to present that evidence, given that we have the benefit of hindsight now, the failure to present that evidence at the time unprofessional conduct by the attorney? Because the standard set by the Supreme Court's case law is really pretty low in terms of what's expected out of an attorney. Why is this set of decisions not to present individual witnesses, the ones you've identified, what makes that unprofessional? This is a case where there was no realistic alternative penalty phase defense. This is not a case that involves a selection from among multiple defenses. There was no question of identity. There was no domination by a co-defendant. The crime was sexual. The upbringing was sexual. The uncharged misconduct evidence was sexual. All of it, not only sexual, but sexual in unusual ways, outside of normal experience. This is not what would come to mind when one talks about a sexually abused child or a sex crime. As I said at the outset, it was a lay jury hearing about it, asked the question, needed the explanation. It's a case where there was no downside risk of opening doors. It was not a case like Hendricks where presenting mental health experts would have brought in additional uncharged crimes that otherwise wouldn't have come in. The Supreme Court in Wiggins said that that is a significant factor. Again, returning to Caro, the Court's first opinion in Caro, faults counsel for not asking prior to trial, during their preparation, a question, explanatory question very similar to the question that the jury at the end of Mr. Raley's second trial asked. What makes this case harder for me is that in most of our ineffective assistance of counsel cases, and I think Caro falls in this category, counsel put limited effort into the case. We have all these tragic cases where counsel starts thinking three days before trial, gee, I better think about a defense and so forth. In this case, it's every indication the lawyers worked hard on it, they consulted experts, and then made a judgment after consultation that there are better ways or better defenses to present or that we should focus our energies on other things. So it's not a matter of not consulting, it's a matter of was the judgment made by the attorneys, two attorneys at the guilt and first penalty, one attorney I guess at the second one, although she was talking to the first attorney while he was still healthy. They did seem to work pretty hard on the case, and in that sense it makes it different from other cases where the lawyer dropped the ball completely. The thing that's the same as those cases where the lawyer dropped the ball completely is that there was no expert given the sum of even what counsel knew about Mr. Raley's background and upbringing in order to make, in order to give informed guidance to counsel. And it is not a case of selection among alternative defenses in the way the court was describing. The presentation at habeas from our experts, Dr. Foster and Counselor Sylla Ballas, is similar to what Ms. Yale tried to argue to the jury but didn't have the evidence to back up. When presented with it later she said, yes, these were the points that I was trying to get across to the jury. So it's not a matter of selection of one defense over another. Mr. Bacon, when you get a moment, would you talk about the jury misconduct claim? We have here things that can't be written off as common knowledge. Because they happen to be false. They came in part to the jury with a juror who had some special knowledge of the criminal justice system. This is a, they are matters extrinsic to what was presented by way of evidence in every sense of the word. The point is that these inappropriate topics, like without parole prisoners getting out, financial cost failure to testify. So in total, juror Teach said, consumed at least 10 percent or more of the time spent in deliberations spread out across the deliberations there were points that the judge had specifically instructed the jury not to consider. Was Teach the only one who testified about the deliberations? He's the only one who testified orally. Juror Angry and Juror Ruscal or Balsita testified by way of written declarations. I was specifically interested in Arlene Balsita. Was her declaration before the judge? Yes, the record was expanded under Rule 7 to include it. I had one more question for you if Judge Silverman is finished with that. That goes back to the penalty phase issue. And one of your claims is that counsel didn't give enough background information to the experts for them to give a meaningful opinion. I'm paraphrasing. But the very fact that they were experts, Dr. Spiegel, you know, says he examined Mr. Raley, and why couldn't they rely on the expert to know what background questions to ask? Why isn't it reasonable to assume that if it is important and typical for a psychiatrist to find out about a person's childhood, that that's what they'll do when they examine the person? And why isn't that part of what you're hiring the expert for rather than part of your job? I'm not sure if I'm making that question very clear. Yes, I do understand the question. And I might have a harder road to hoe if any of these experts had been consulted specifically with reference questions about mitigation. Dr. Spiegel and the others were initially consulted very early on, before there was any life history, to give to them with very general, non-specific questions that included insanity, competency to stand trial, and anything else. And when Ms. Yale returned to Dr. Spiegel, it was only with reference to the information about the Uncharged Juvenile Sexual Acts, which he had no way of putting in context without knowing the remainder of Mr. Raley's life history. But again, if the expert himself believed that that was essential, if that should have alerted a reasonable person who has expertise that maybe there is more to the person's background that he needs to know, I guess what I'm struggling with is when you consult an expert, how much you are allowed to rely on the expert themselves to dictate what information they need. The first step in the process is the reference question from counsel to the expert. And Bean, Summerlin, and Daniels are all examples of cases where an expert was not consulted specifically for purposes of mitigation, and probably in part at least as a result of that, was not able to contribute appropriately to the mitigation case. Again, I believe I spoke a few moments ago about Judge Kozinski's opinion in Wallace about once the expert is retained for purposes of mitigation, that it is the responsibility of counsel, not just the responsibility of the expert to see that the expert has the information that he needs. But who's supposed to know that? I mean, as between the expert and the lawyer, how's the lawyer supposed to know what it is the expert is going to think that he needs? It's an informed two-way dialogue, and it is for these purposes to see the responsibility of the attorney, to see that it is fully informed, both that the expert knows what the lawyer needs from the legal perspective and that the expert has the information that the lawyer's investigation has provided that will help the expert along. So with that, I will reserve time for rebuttal. Roberts. Thank you very much, Mr. Bacon. Good morning. May it please the Court, Violet Lee for Respondent Appleby. The district court held an evidentiary hearing over the course of three days to hear the evidence that Petitioner believes the jury should have heard. In the end, the district court found that the trial counsel in this case reasonably investigated the mental health defenses and effectively represented Petitioner at trial. This was correct. Trial counsel knew before trial about potential mental health defenses, and for that reason, he consulted three experts, Dr. Spiegel, Dr. Livingston, and Dr. French. Dr. French said Petitioner had multiple personality disorder. Dr. Spiegel said Petitioner was a sexual psychopath. And this is also what Dr. Livingston said. Where does it ñ who said he was a sexual psychopath? This is ñ these are statements made by the defense counsel and his name just ñ Do you have anything from Dr. Spiegel? Precisely, Your Honor. I have documentation produced in connection with the ñ with the 2003 evidentiary hearing from Drs. French and Spiegel. These are contemporaneous notes taken in 1985. And in 1985 ñ I didn't see anywhere where Dr. Spiegel called him a sexual psychopath. Well, not sexual psychopath, Your Honor, you are correct. Dr. French, in a 1985 memo to Mr. Schuckmeister, said Petitioner suffers from multiple personality disorder. And this is what he ñ this is what Mr. Schuckmeister also represented, that Dr. French said he had multiple personality disorder. Dr. Spiegel and Livingston said sexual psychopath. Where? That's what we're looking for directly from those doctors. Where in the record? Can you point to the page where Dr. Spiegel or Dr. French directly says that? Well, Dr. Spiegel's notes from 1985 do not say that ñ do not mention sexual psychopath. However, let me read to you the notes that he did have that are very pertinent to his observation. What page are you referring to in the excerpt? Let's see. If you give me just a moment, Your Honor. This is Dr. Spiegel's. While you're looking for that, I'll just tell you that it looks to me like the sexual psychopath thing came from the unsigned declaration. That's correct. Well, if it's unsigned and he wouldn't sign it, I don't know what we ñ Well, it was vouched for by the defense habeas counsel who filed this declaration along with her declaration stating that these are the statements of Mr. Schuckmeister at the time she interviewed him. So on that basis ñ and these, of course, were declarations submitted by the Petitioner. Was there an effort made to depose Mr. Schuckmeister? There was an effort made to depose Mr. Schuckmeister, which the people opposed at that time. Why was that? For the reason that under California law, discovery in the way of depositions need to be in connection with a habeas proceeding. At that time, Petitioner had no pending habeas petition in the State court. He had a pending direct appeal. At any time, he could have filed a habeas petition by which then he would be entitled to proceed with discovery and to depose Mr. Schuckmeister. All we asked for was that he file a habeas petition making the claim of ineffective assistance of counsel so that we could see what the claim was and so that he would comply with California law and procedure. And on that basis, the Superior Court of California denied the request. The request was then made to the California Supreme Court, and it was also denied. And at that time, and at any time, at any point in time, Petitioner could have filed a habeas petition, and that would have entitled him to discovery, but he refused to do so. And that was the reason why we opposed it. And that was, I assume, the reason why it was denied. Okay. Counsel, let me just tell you what my concern is from the point of view of your side of the case, and perhaps you can help me. If we were to reach the prejudice prong, if, and I know that you don't agree that we should, why isn't there an awfully good case that where the jury specifically asks for expert testimony and doesn't get it, that prejudice is shown from the absence of the kind of material that was brought forward at the evidentiary hearing? Your Honor, may I first answer the question, what page the Supreme Court is on? Yes. Thank you. Yes. The 1985 notes from Dr. Spiegel in which he says, based on his interview of Petitioner, that Petitioner was oriented to time, place, and person. Diagnostic impression is a dependent personality disorder, anxiety disorder. And then he specifically says he has little dissociative capacity. The Bob voice does not seem to be a schizophrenic hallucination, nor a dissociative personality, but may be some symbolic representation of his unconscious rage. That is found in the volume submitted by Petitioner, the white volume submitted by Petitioner at page 598 to 599. Now, in answer to Justice Graber's question about prejudice, we know, based on the evidence produced over the course of three days at the evidentiary hearing, what Petitioner claims should have been brought to the jury. We know that the testimony brought forth by the Petitioner by way of Sylla Ballas and not persuasive, and let me address why it was not persuasive. Sylla Ballas, of course, did the social history on Petitioner, and the vast majority of that information had already been presented to the jury at the penalty phase. And, you know, the sister, Kathy Raley, and the father, Ralph Raley, testified extensively about the very abusive background that the Petitioner grew up in, the making the defendant at age 12 take a bath with the mother, demanding him to bring drinks into the bath to her in the bathtub, throwing his clothes out of the house, demanding that he leave the house, get out of here, we don't want you. This was a very telling, a very accurate portrait of Petitioner's childhood was painted for the jury, so the jury knew all this. So Sylla Ballas' testimony added very little, if anything, to what the jury knew. Dr. Foster's testimony was not credible for a couple of reasons. Dr. Foster testified that Petitioner had organic brain damage, and that he was acting unconsciously as a result of this organic brain damage. But we know from his testimony that there are no tests, there are no brain scans showing, proving that he had organic brain damage. Dr. Foster's conclusion was based on an assumption. And in the words of the district court, in the district court's order, Petitioner's own expert, Dr. Foster, admitted on cross-examination that he had no proof that Petitioner suffered organic brain damage. He merely assumed such conclusion based on evidence contained in medical literature. And that, of course, comes through in the testimony of Dr. Foster, and we cite it to the page in our brief, where he says, I am making, I'm assuming that. There's other reasons why Dr. Foster's testimony was not convincing. Dr. Foster threw out a number of vague, noncommittal, multiple diagnoses of what Petitioner may have. He said, in addition to the organic brain damage, Dr. Foster said Petitioner may have been exposed to alcohol in utero. Petitioner had symptoms consistent with PTSD. He had pervasive developmental disability not otherwise specified. He was very anxious. He had an obsessive compulsive disorder. He had a disability similar to Asperger's syndrome, but he didn't actually have this. He may have had attention deficit disorder. He had an indication of bipolar disorder, but it was unconfirmed. He had a predisposition to dissociate, but he had no associative identity disorder, and he had symptoms of psychotic behavior. Now, a jury who heard this testimony would think that, you know, Dr. Foster's just throwing out a lot of, you know, unconfirmed, noncommittal type of a diagnosis, just to see what might stick. Another reason why Dr. Foster's testimony was unpersuasive is because the evidence was not unconfirmed. The state presented the expert testimony of Dr. Martell, who was very convincing in refuting the testimony of Dr. Foster. Dr. Martell explained precisely why it was inappropriate for Dr. Foster to rely on the Scientific American article that he did, and why the conclusion of organic brain damage was unsupported. What are you supposed to make of the facts? Again, going back to what I think Judge Graver was asking about, that the jury during the second penalty phase comes out and asks if there's any testimony of this kind. And having had a fun jury the first time, I think it's fair for Petitioner to argue, as he has, that there's an inference that it's close. And the second time, the jury affirmatively asked, for something that's not there. Doesn't that give us some reason to think that if it had been there, the jury would have been interested and might have reached a different result? And in particular, I urge you to go beyond Dr. Foster, because on some level I'm less concerned about Dr. Foster, who wasn't somebody who the defense counsel did consult. And look at the experts the defense counsel did consult. You argue in your brief, I think effectively, that Ms. Yale gave a stirring closing argument. In fact, I thought it was a stirring closing argument. What I wondered, if you're going to argue what is an effectively mental health type defense, referring to the abuse he suffered as a child and so forth, why not complete the circle and offer up an expert to try to put it in terms that make the jury think that here's the psychiatrist or psychologist testimony we're looking for? Well, for a very good reason, Your Honor. It's because at that time, in those circumstances, Mary Yale had an expert or actually she was aware of three experts, but in this case in the end, just before the penalty phase retrial, she spoke to and spoke to, she met twice with him on a number of occasions by phone, consulting with him once again on the mental health of the petitioner. And at that time, her notes state defendant was able to control him. These are her notes of her conference with Dr. Spiegel. Defendant was able to control himself, control the outward signs of his illness. Defendant was making a choice. In a sense, he knew what he was doing was wrong. So what we have is... I understand that speaking certainly to the guilt phase, but at the time of the penalty phase, we're beyond the legal definition of insanity and so forth. We're trying to explain is this person the kind of monster for whom society reserves the most extreme punishment or are there things in his background that even though he's guilty, even though he could have stopped, that he was driven to do this by things that we shouldn't hold him as culpable for? The kind of argument that she actually made, and although I understand what you're saying with regard to Dr. Spiegel's findings with regard to... I also read what he said. It seemed to me he gave some degree of support to the notion that the kind of abuse he suffered as a child had at least some role in explaining what he did later. And then if you look at the declaration he files after he's been given the pardon, he's been given the right to talk about the social history in somewhat more detail. He goes on to say, you know, if he'd been given help when he was young, it's not likely he would have committed this crime. Isn't that something that would be useful for a psychiatric or psychological expert to say to the jury? Well, the portrait that was painted for the jury at the penalty phase was very accurate and very telling. Even without any further expert testimony, the jury could certainly connect the disadvantaged background of petitioner with the crimes. They didn't need an expert in order to connect the dots here. And certainly the... Well, yes, that's true, but the tactical decision, given the information that counsel had at that time, was to go without an expert and to present the family, the portrait of the family life through the sister's testimony, which based on the juror questionnaires after the first penalty phase was very effective, very moving, and also the father's testimony. And they had a very intimate insight into what the family life was like, and they told it like it was. With respect to Your Honor's question about what the experts would have said had they been presented with the social history, Dr. French said, I could have testified that Mr. Raley was clearly more at risk for dissociative disorder than a normal person because of his upbringing. This doesn't sound very convincing or said with much conviction. The fact that he might have... was at most more at risk for this dissociative disorder doesn't... He didn't actually have it, so the fact that he was at risk for it is sort of beside the point. Exactly. And at the evidentiary hearing, Sylla Ballas actually said he had the disorder, and even then the district judge found her testimony unconvincing. So someone who gets up on the stand and says, well, he's more at risk for this disorder, wouldn't have been any more convincing. And Dr. Spiegel said, had he had this social study, the material provided to him would have been more convincing. And the material provided by Ms. Ballas would have reinforced my conclusion in 1985 that Mr. Raley did not have the personality pattern or history of a psychopath. Well, again, that's not terribly helpful to the defense. It doesn't really say that, you know, he had a particular mental defect that caused him or that contributed significantly to his crimes and therefore mitigated these crimes. So even these experts who were consulted in 1985, having read now the materials that Petitioner argues they should have had, really wouldn't have come forth with anything very convincing. You know, one thing that's puzzling to me is Ms. Yale submitted, I think, three declarations, if I remember correctly. That's correct, Your Honor. And I don't see anywhere in there where she explains why she made the decision she did not to call a mental health expert at the penalty phase. Did I overlook it or? I think you're correct, Your Honor. She doesn't actually come right out and say, and give a reason for not calling an expert in the penalty phase. She didn't testify at the evidentiary hearing? No, that's correct. She did not testify at the evidentiary hearing. It was a... What do we do about the fact that she's never explained, never said this was a tactical judgment on my part? I didn't want the bad stuff to come in, so I, or whatever she would have said. Well, I think that we can see from the evidence that was presented at the evidentiary hearing that it was a tactical judgment. I don't think that you need a statement from her precisely on that point. Isn't that the key point? I mean, that's everything. Well, I certainly think that you can infer that she made a judgment not to call. I mean, you can look at this record, and she certainly, she interviewed each juror from the first penalty phase in some detail, understood exactly what their thought processes were, and knew how to go from there, consulted with Mr. Schuckmeister on the... The results of those interviews with the first jurors, didn't they say they wanted mental health evidence, or wondered about his mental health evidence? Some of them said, you know, we were wondering about what he was thinking when he did this. But you know, you can see from her conduct, she knew about the mental health, potential mental health experts. And she consulted with Dr. Spiegel just before the penalty phase, you know, met with him twice, spoke with him numerous times on the phone. She was aware of this. It was a tactical decision. She wasn't, you know, oblivious to this. So even without an express statement in any of her declarations that this was a tactical decision, I mean, you know, perhaps, you know, was a... She was being... Perhaps she just... I don't know her reason for not stating it. We did not submit her declarations. Can you figure out what a downside might have been? If we have to infer the decision, is there an explanation for the decision? I mean, she did work hard on it. She did lots of work. I get to that point, and I understand that I've got the advantage of hindsight. But I'm puzzled as to what rationale there could be, not to... Given that some of the first trial jurors seem to be looking for it, and we know that the second trial jury came out and asked, is there an affirmative reason not to make the decision? Is there a reason not to offer up a professional to testify? Yes, Your Honor. I have never personally met Dr. Spiegel or any of the other experts consulted by the defense team. But possibly Ms. Yale might have felt that Dr. Spiegel would not have made an effective witness. He certainly didn't have anything very positive to say on behalf of the defense at that time, or even now. And possibly Mary Yale might have felt that the State could have come up with someone like Dr. Spiegel to testify. But I do know that someone like Dr. Martel was highly effective at the evidentiary hearing, and stated his opinion that the defendant was not suffering from any mental disorder. His problem was anxiety and, you know, social anxiety and being socially ill at ease. And this certainly didn't explain why he killed one person and attempted to kill another. So, you know, Dr. Spiegel was not an expert. Dr. Spiegel could have just withered under cross-examination, and he could have been very effectively refuted by an expert from the State. So, for these reasons, she could have chosen not to present an expert, and to rely on the family members to paint this portrait, and then to give a very stirring closing argument, as she did. Some of that argument, you could see she tracked what Mr. Schechtmeister did at the hearing, and that was very effective. And she went on beyond that. She talked about institutional rehabilitation, that he had been a model prisoner in jail for the last three years. She certainly expressed in great length the disadvantaged background that Petitioner came from, and that perhaps you or I may have survived this background better, but Petitioner simply didn't have the resources, didn't have the capacity to survive this ordeal in childhood, and to come out of it unscathed. It didn't take much for the jury to be able to connect the dots that this childhood that he suffered through may be the cause for what happened. I'm trying to pull some loose ends together. I know what Dr. Spiegel would have said, and I think I know what Dr. French would have said. Do we know what Dr. Livingston would have said? The Petitioner did not submit a new declaration from Dr. Livingston for the evidentiary hearing, so we don't know what he would have said. That's just a big question mark out there. Correct. I would like to address one question that Justice Graber asked Mr. Bacon, and that was with respect to, shouldn't the experts know what questions to ask, and not have to rely on counsel to supply all the information, sua sponte? And, you know, I did note that Dr. French, in a 1985 report, his notes show that he knew about the Petitioner's background. His note says, a developmental history characterized by numerous beatings at the hands of his mother. And also, Dr. Spiegel knew about his childhood problems. In a 1985 report, Dr. Spiegel noted Petitioner has repressed his tremendous rages toward his mother. So it's quite clear from these notes that both Drs. French and Spiegel had interviewed Petitioner about his childhood, knew about his background, and probably knew a lot more than the brief notations made in these 1985 reports. Counsel, before you run out of time, Judge Silverman asked opposing counsel about the jury misconduct claim. Could you comment briefly on that as well? Yes. Mr. Teach, one of the jurors, was the only juror who testified at the evidentiary hearing, and he explained that the jury did talk intermittently during deliberations about whether Elwott would actually be a life sentence, and that they did talk intermittently about the fact the defendant did not testify. And there was mention about the cost of an Elwott sentence versus a sentence of death. However, these discussions were intermittent. Cumulatively, they were brief compared to the overall discussions. There were competing views expressed by the jurors. There was no dominant view. There was – and these views, it appears, came from the common sense, common knowledge, you know, everyday understanding of jurors that people – that jurors bring to the courtroom. That part I understand about the cost of incarceration and what a life sentence means. I don't quite get how the district judge dealt with the fact that they talked about his failure to testify. That seems to be reduced to a kind of a cryptic footnote in the order. I – am I right? He says the general discussion of the fact that Petitioner chose not to testify did not constitute an improper review of extrinsic evidence. That's his total discussion of the failure to testify. And we have the affidavit of Arlene Valceda, who said that they discussed it apparently with some – it was an important part of some of the discussions. Well, that would be refuted then by Mr. Teach, who testified at the hearing that it was – you know, it wasn't a dominant part of the discussions. He said that it was 7 to 15 minutes overall, and it was intermittent. Are we allowed to even get inside the jury deliberations in that way? I mean, clearly it violated the instructions to consider, if they did talk about it, that the defendant didn't testify. But what do we do about that when the jurors, in their deliberations, talk about things that happened or didn't happen at the trial? That is, they're not extrinsic to the trial, they're part of the trial, and they're part of the jury's thought process. Are we allowed to delve into that? Well, Your Honor, we had opposed Petitioner's making this claim on that basis, that it involves the thought process even more. And that we are prohibited from going into that. The district judge rejected our argument and proceeded. But I do agree with you, Justice Graber, that – That's a question. I'm asking you a question. I'm sorry. I'm sorry. I'm asking you a question about whether or not he actually did testify. It's not extrinsic to what happened in the courtroom. It's not new information brought in. Everybody could see that he didn't testify. The fact that he remarked on it may have been against the instructions not to discuss that in your deliberations, but certainly it's not extrinsic evidence. Everybody was aware that he didn't testify. It went beyond that. I mean, Balsita's declaration went beyond the fact that everybody knows that he didn't testify. I thought she said they – I wish I had it in front of me. I was just looking for it. But it was in effect that drew an inference against him for not testifying. Well, that again, Your Honor, would be refuted by the testimony of Mr. Teach, who testified at the evidentiary hearing. Okay, but the district judge didn't say, I believe Teach and I don't believe the other one. He didn't deal with it that way. Well, certainly one can make that inference on the basis of his order. Mr. Teach did say that nobody decided that he deserved death because he did not testify. You've got about 20 seconds left if you want to wrap up. Okay. Thank you. In short, the Petitioner was given an opportunity at the evidentiary hearing to present the very defense that he believes counsel should have presented. What the district court heard from Dr. Foster and Ms. Fallas was not convincing. Counsel was not ineffective in their investigation, and any omissions did not result in prejudice to the Petitioner. Thank you, Your Honor. The district judge failed to apply the proper legal standard for prejudice under Wiggins and Terry Williams. It's not about which witness the district judge found convincing or not. It's a matter of reweighing the aggravating evidence against the totality of the available mitigation from trial and from habeas, and determining if there's a reasonable probability that at least one juror would have struck a different balance if that additional mitigation had been presented. Here we're talking about at least one juror on a jury that asked for psychological evidence. As to the defense case presented at the penalty phase, largely through Mr. Raley's mother and father and his sister and mother as a rebuttal witness, based on that evidence, the district attorney was able to argue to the jury that Mr. Raley had done something wrong. Mr. Raley was a good and supportive and caring parent when he grew up. That is simply false. Ms. Yale had not presented the evidence that she could rely on to tell the jury that that was false. So that makes clear that this is not just a matter of cumulative evidence, just something that the district attorney was able to do. I think it would be harmless that this false impression could be made based upon the evidence presented at the penalty phase and couldn't be refuted. As to state habeas law, Mr. Raley would not have been entitled to discovery simply upon the filing of a habeas corpus petition, but only in that handful of cases. In cases in which the court at some unspecified time down the road grants an order to show cause, which is only a small proportion of the cases and often is a great length of time after the petition is filed, that would not have been an appropriate remedy to take the deposition of a witness such as Mr. Schechtmesser, who was terminally ill at the time. As I set out in the briefs on pages 64 to 66 of the opening brief, that fundamentally what we're talking about in mitigation in a penalty phase is not diagnoses out of the DSM, we're talking about explanations for behavior. We're talking about Dr. Foster saying that this man functioned like he had half his brain tied behind his back, that he functioned like a 10-year-old, except under stress, regressed to where he was. And Dr. Foster was able to find in the background information, background information that was not before the jury, these same themes that he was then able to find in Laurie McKenna's testimony about what happened at Carol Ann's, able to tie them together in a way that the jury couldn't, both because there was no expert and both because there was such a narrow and incomplete picture of what David Raley's life had been. Growing up. Ms. Lee has, as good as said, that Ms. Yale did what the 11th Circuit, I believe, called putting on a psychiatric defense without a psychiatrist. Refer the court in the brief to Daniels, to Jennings, to Bloom, and to Seidel, all of which this court has recognized that doing so is not a good thing. It's ineffective assistance of counsel, and that argument is no substitute for the evidence to back it up. But let me ask you, and our presiding judge may indulge you a few seconds beyond the answer to this question to sum up. The response I heard from the State to the why not question was, in essence, as I understood it, that the professional, that, say, Dr. Spiegel's testimony, the professional testimony that might have been offered would not have been that compelling and would have opened the door or made it more likely that the State would present someone who might have been more effective on that subject and, in the end, weakened the argument that Ms. Yale could have made to the jury at that time. Why would that not be a professional judgment that ought to be respected as such? Why is that an unprofessional judgment if that was the reasoning process, and we're speculating, we don't know her reasoning process? But if that was it, what's unprofessional about that? The absence of full-length information about Mr. Railey's background in the hands of experts rendering these opinions, which, therefore, even despite the late stage of the case, are still preliminary ones, and the absence of some particular reason to fear the calling of a rebuttal expert, as I said, nothing present such as in Hendricks where there was additional evidence that would be elicited. Here, the rebuttal expert would have the same material to work with that the defense testifying expert would, and also, as I said before, there was no reasonable alternative defense to give up the line of mental health and seek mitigation in another way. So for all those reasons, this case is different from the ones that the defense testifying expert would have. Your Honor is referring to. The summation is what I began this rebuttal with, that the district court failed to apply legal standards from the Supreme Court in Wiggins, from this Court, as to either performance or prejudice. Mr. Railey received ineffective assistance of counsel. He was prejudiced, and he is entitled to relief. Mr. Bacon, thank you very much. Ms. Lee, thank you as well. The case just argued is submitted. The arguments were very helpful. Thank you. Indeed they were. We'll recess now. We have some high school visitors, and we'll be back in about 20 minutes to say hello to you. Thank you.
judges: Silverman, Graber, Clifton